Richard L. Jenson (USB#11682)
2244 South 1640 West
Woods Cross, Utah 84087
Tel: 801.383.3710
Fax: 801.649.0984
LJenson@classicaviation.net

Attorney for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH,  NORTHERN DIVISION

| | |
|---|---|
| CLASSIC HELICOPTER GROUP, LLC, a Utah limited liability company, and CLASSIC AIR CARE, LLC, a Delaware limited liability company d/b/a CLASSIC LIFEGUARD,<br><br>    Plaintiffs,<br><br>  v.<br><br>COMMISSION ON ACCREDITATION OF MEDICAL TRANSPORT SYSTEMS, a Pennsylvania corporation, EILEEN FRAZER, an individual, and JOHN DOES 1-99,<br><br>    Defendants. | **VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL**<br><br><br><br><br><br>Civil No. 1:13-cv-00006-TC<br><br>Judge Tena Campbell |

Plaintiffs, Classic Helicopter Group, LLC, and Classic Air Care, LLC, d/b/a Classic Lifeguard (collectively "Classic"), through counsel, file this Verified Complaint and complain and allege of Defendants, Commission on Accreditation of Medical Transport Systems ("CAMTS"), Eileen Frazer ("Director Frazer"), and John Does 1 through 99 ("Defendants John Does 1 through 99") as follows:

## INTRODUCTORY STATEMENT

1.      This suit arises out of CAMTS's arbitrary and capricious application of its enforcement power for the purpose of stripping Classic of its ability to compete in relevant markets.  Classic has been forced to bring this action because CAMTS unjustly denied Classic an accreditation necessary for Classic to continue to operate its air-ambulance carrier business ("Carrier") in Utah and Colorado.  While the antitrust laws permit CAMTS to impose and enforce rules or standards to promote CAMTS's stated goal of air-ambulance safety, such rules must be reasonably related to those purposes and must be enforced through procedures designed to prevent their arbitrary application.    CAMTS's rules and enforcement procedures do not meet these requirements.  Classic meets or exceeds 98.0% of CAMTS's accreditation standards, yet CAMTS has repeatedly refused to acknowledge that Classic is in substantial compliance and deserving of Full Accreditation.  Even as Classic has corrected the majority of the purported deficiencies and is now 99.9% compliant, CAMTS still will not accredit Classic and will not allow Classic to reapply for accreditation for six (6) months, which will effectively put Classic out of business.  CAMTS's decision to strip Classic of its accreditation and impose a punitive suspension is motivated by CAMTS's apparent desire to control the air-ambulance market.  As evidence of this, CAMTS has proactively been trying to get Classic's air-ambulance license stripped in numerous CAMTS-regulated states.

2.      CAMTS's Board of Directors ("CAMTS's Board") is disproportionally represented by larger Carriers, some of whom are in direct competition with Classic,

and it has tailored its accreditation standards to benefit the larger Carriers in an attempt to force smaller, rural Carriers out of business.   CAMTS's anti-competitive intent is patently clear from its own rationale for withdrawing accreditation from Classic.  CAMTS ostensibly cites safety concerns as the reason for withdrawing accreditation, yet it granted Full Accreditation to numerous Carriers with safety records similar and/or worse than Classic.  The only reasonable inference from this unequal treatment is that CAMTS desires to restrain trade and/or to unfairly punish Classic.  CAMTS has purposely made many of its accreditation standards unreasonable and arbitrary to restrain trade and limit competition from smaller Carriers.   Furthermore, CAMTS's withdrawal of Classic's accreditation and 6-month suspension for minor deficiencies is punitive and unreasonable.  Allowing CAMTS to unjustly ground Classic will likely result in reduced air-ambulance services in remote areas where ground ambulances cannot go.  The lack of competition will lead to higher prices and slower emergency response times, which will cost patients more money and potentially their lives.

3.     Classic seeks judicial review of CAMTS's egregious actions pursuant to federal common law as embodied in the standards of judicial review under the Administrative Procedure Act (hereinafter "APA"), 5 U.S.C. § 701 *et seq.*, and the common law of the state of Utah.  These standards of judicial review require that an accreditation decision by CAMTS be in accord with due process, that is, the decision must be rationally connected to the facts on the record and not arbitrary and capricious. This is also an action under Section 1 of the Sherman Act, 15 U.S.C. § 1, which prohibits agreements and conspiracies in restraint of trade, Section 2 of the Sherman

Act, 15 U.S.C. § 2, which prohibits the abuse of monopoly power, and the Clayton Act, which provides a private right of action for violations thereof.

## PARTIES, JURISDICTION AND VENUE

4.      Plaintiff Classic Helicopter Group, LLC, formerly known as Classic Helicopters Limited, L.C., is a Utah limited liability company established under the laws of Utah.   Classic Helicopter Group, LLC is the holder of the following air Carrier certificate numbers issued by the Federal Aviation Administration ("FAA"): JAPA115F (Part 135), JAPG115F (Part 137), JAPL115F (Part 133).   Classic Helicopter Group, LLC's headquarters and principal place of business is in Woods Cross, Davis County, State of Utah.  Classic Helicopter Group, LLC provides the air transportation capability that Classic Air Care, LLC, utilizes to provide air ambulance services in Utah, Arizona, Colorado and Wyoming.

5.      Plaintiff Classic Air Care, LLC, a limited liability company established under the laws of Delaware, is an air-ambulance Carrier licensed under the laws of the States of Utah, Arizona, Colorado and Wyoming and is duly authorized to do business in those States.   Classic Air Care, LLC, is headquartered in Woods Cross, Davis County, State of Utah.

6.      Defendant CAMTS, a corporation established under the laws of Pennsylvania, is a non-profit agency that audits and accredits fixed-wing (airplane) and rotary-wing (helicopter) air medical transport services as well as ground interfacility critical care services in the United States, Canada, the United Kingdom and South Africa.  CAMTS's headquarters and principal place of business is in South Carolina.

7.     Defendant Eileen Frazer is an individual who resides in Colorado. Ms. Frazer is the Executive Director of CAMTS ("Director Frazer").

8.     Defendants John Does 1 through 99 include other Defendants unknown at this time who have participated in or unfairly influenced the CAMTS's accreditation process involving Classic.

9.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337 and 1367.  This Court also has diversity jurisdiction over this matter under 28 U.S.C. §§ 1332(1) because Plaintiffs are not citizens of any state of which Defendants are citizens and the amount in controversy exceeds $75,000.00.

10.    Venue is proper in this Court pursuant to 15 U.S.C. § 22 and 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims occurred in this district and the Defendants transacted business in this district.

11.    This Court has personal jurisdiction over Defendants because Defendants transacted business in this district and engaged in actions that were directed at and had the intended effect of causing injury to persons and entities residing in, located in, or doing business in this district.

## FACTUAL BACKGROUND
## SECTION I: CAMTS'S ACCREDITATION IS ESSENTIAL FOR CLASSIC TO COMPETE IN THE GEOGRAPHIC AREA; DAMAGES SUSTAINED BY CLASSIC

12.    Classic realleges the foregoing paragraphs as if fully rewritten herein.

13.    Classic provides fixed-wing and rotary-wing air-ambulance services in the rural areas of Utah, Arizona, Colorado and Wyoming and maintains aircraft bases and staff in the towns of Page, Arizona; Vernal, Utah; and Riverton, Wyoming.

14.     CAMTS is a private standard-making organization that has provided accreditation for Carriers since 1991.

15.     CAMTS is the most widely recognized organization in the United States that provides air-ambulance accreditation.  The accreditation that CAMTS provides to Carriers is required by numerous hospitals, medical organizations and government agencies as a contractual prerequisite when engaging air-ambulance services such as Classic.

16.     In principle, CAMTS's accreditation is voluntary.  However, an increasing number of state governments require Carriers to be CAMTS-accredited in order to be licensed to operate.  Even in states that do not require CAMTS's accreditation, an increasing number of air-ambulance contractors now require CAMTS's accreditation or give a major preference to Carriers that are CAMTS-accredited.  As such, CAMTS is the gatekeeper that determines market access and provides a business element necessary for effective competition.  CAMTS's accreditation standards are endorsed by many state government laws; however, CAMTS has no direct state or federal oversight.  With unchecked power, no accountability and very little transparency, CAMTS is a monopoly that has almost complete control over which Carriers can compete in CAMTS-regulated states.

17.     Classic was first accredited by CAMTS in 1999.  Classic has received accreditation from CAMTS until it was withdrawn on July 24, 2012.

18.     CAMTS's accreditation is essential to Classic's prosperity and existence as a Carrier.  CAMTS's accreditation is specifically required of air-ambulance services

in several states where Classic operates and in several states where Classic is looking to expand.

19.     The States of Utah and Colorado require Carriers to be CAMTS-accredited in order to obtain an air-ambulance license.   Without an air-ambulance license, Classic will no longer be able to operate as a Carrier in those states. (See Utah Administrative Code § R426-2-2(11); Colo.Rev.Stat. § 25-3.5-307(1)(a)).

20.     Air-ambulance flights in Utah and Colorado account for 40%-50% of Classic's revenue.

21.     CAMTS's refusal to grant accreditation to Classic will cause Classic to lose approximately $9,948,750.00 in annual revenue if Classic is not able to operate as a Carrier in Utah and Colorado.   Sustaining such losses would put Classic out of business.

**SECTION II: CAMTS'S ACCREDITATION PROCESS / CAMTS'S REFUSAL TO ACCREDIT CLASSIC DESPITE SUBSTANTIAL COMPLIANCE**

22.     To become CAMTS-accredited, a Carrier must go through CAMTS's accreditation process and pay a non-refundable application fee of $750.00, on-site inspection fees of $2,000.00 to $3,000.00, and an accreditation fee of $6,500.00.   If CAMTS has any concerns, CAMTS requires the applicant Carrier to pay additional fees for more site inspections and for hiring CAMTS-approved consultants.   CAMTS's site inspector and consultant pricing ranges from $500.00 per day or $200.00 an hour plus all travel expenses.   All application fees, accreditation fees, on-site inspections, and consultant fees are paid for by the applicant Carrier.

23.     Since 2008, Classic has paid CAMTS over $43,000.00 in application fees, accreditation fees, consultations, and for numerous on-site facility inspections to maintain its CAMTS's accreditation.

24.     CAMTS's accreditation process is based upon compliance with the CAMTS's Accreditation Standards, the CAMTS's Policy and Procedure Manual, submission of a Program Information File, and on-site base inspections performed by CAMTS's representatives.

25.     CAMTS's accreditation standards are outlined in the CAMTS's 8th Edition Accreditation Standards Manual ("CAMTS's 8th Edition Standards").  A copy of the CAMTS's 8th Edition Standards is attached hereto, marked as "Exhibit A." and is incorporated herein by this reference.

26.     CAMTS's policies and procedures are outlined in the CAMTS's Policy and Procedure Manual ("CAMTS's Procedure Manual").  A copy of the CAMTS's Procedure Manual is attached hereto, marked as "Exhibit B." and is incorporated herein by this reference.

27.     CAMTS's accreditation standards were created and are frequently revised by the CAMTS's Board and Director Frazer.

28.     CAMTS's future accreditation standards are outlined in the CAMTS's 9th Edition Accreditation Standards Manual ("CAMTS's 9th Edition Standards").  A copy of the CAMTS's 9th Edition Standards is attached hereto, marked as "Exhibit C." and is incorporated herein by this reference.

29.     A Program Information File ("PIF") is a comprehensive application that must be completed by the applicant Carrier.  A PIF application is over 100 pages long and consists of requests for information and documentation regarding compliance with the accreditation standards outlined in both the CAMTS's 8th Edition Standards and the CAMTS's Procedure Manual.  The PIF is a labor-intensive process that can take from three (3) to six (6) months to complete.  CAMTS allows a Carrier one (1) year to complete the PIF and submit all the accompanying documentation.

30.     After submitting the PIF, CAMTS will schedule an on-site base inspection with the applicant Carrier within four (4) to six (6) weeks.  The on-site base inspection consists of two (2) CAMTS's representatives spending a minimum of two (2) days at the Carrier's base(s) to verify that it is in compliance with CAMTS's accreditation standards.  The CAMTS's representatives verify the PIF responses and score/grade the applicant Carrier.  Additionally, the applicant Carrier's employees are each given an anonymous survey so that they may secretly relay to CAMTS any personal grievances that they may have against the applicant Carrier.

31.     The CAMTS's scoring system is largely subjective and lacks transparency.  As such, the accreditation standards are likely not enforced uniformly from one Carrier to another; some Carriers are held to higher standards and/or unwritten rules while other Carriers are not.  Classic is in compliance with 98.0% of CAMTS's accreditation standards, yet CAMTS has repeatedly refused to acknowledge that Classic is in substantial compliance.  If all the Carriers were held to the same scrutiny as Classic, it

is highly unlikely that all of the accredited Carriers achieved a higher compliance score than 98.0%.

32.     After the site inspection, the CAMTS's Board holds a meeting to review the PIF and on-site inspection report and discusses, behind closed doors, if a Carrier is to be granted or denied accreditation.  CAMTS does not allow the applicant Carrier to attend, nor is the applicant Carrier informed of what is discussed.

33.     CAMTS's accreditation decisions are also based upon the anonymous surveys from the employees of the applicant Carrier.  Said survey results are not presented to the applicant Carrier, and the applicant Carrier is unable to refute the survey results.  CAMTS also refuses to divulge any other "anonymous" complaints that CAMTS has received about a Carrier, even when those complaints are used in determining the Carrier's accreditation status.

34.     CAMTS's final accreditation decisions are made by the CAMTS's Board. The CAMTS's Board is made up of 21 members, each with a vote.  The CAMTS's Board is disproportionally represented by members who are employed by larger Carriers and does not adequately represent the interests of small and/or rural Carriers.

35.     CAMTS arbitrarily enforces its rules, forcing certain Carriers to meet higher standards or unwritten rules that other Carriers are not required to meet.  Upon information and belief, Classic believes that it was subject to more scrutiny and unfavorable evaluations than other Carriers with similar minor deficiencies.

36.     The CAMTS's accreditation process lacks transparency. CAMTS has repeatedly refused to give Classic information on how the CAMTS's Board evaluates

Classic, citing such information as confidential.  Classic has repeatedly requested the CAMTS's Board for meeting records (e.g. meeting minutes, evaluation discussion, notes, vote tallies, complaints, anonymous surveys, etc.) regarding how Classic's accreditation decision was determined.  CAMTS has refused to divulge such information.

**A.  CAMTS Has Strayed from its Original Mission of Carrier Safety**

37.    Since its inception, Classic believes CAMTS has played an important role in developing and establishing various standards by which to measure a Carrier's level of quality in the areas of patient care and safety in fixed-wing and rotor-wing ambulance services.  However, recent evidence suggests that CAMTS has strayed from its core principles and is operating far beyond the scope of its authority.  For instance, CAMTS has demonstrated institutional bias (e.g., Director Frazer has a conflict of interest with a competitor of Classic, yet she refuses to recuse herself from accreditation proceedings involving Classic), arbitrary and inconsistent enforcement of misguided standards (e.g., mandating unreasonable crew shifts for rural Carriers, penalizing certain Carriers for perceived deficiencies while overlooking the same violations of other Carriers, etc.), and a lack of transparency (e.g., using anonymous survey results, acting on unsubstantiated reports proven to be inaccurate, refusing records requests, etc.).

38.    CAMTS has reached well beyond its original role of regulating air-ambulance safety and has expanded its authority into territory traditionally governed by U.S. government organizations, including the FAA, the National Transportation Safety

Board ("NTSB"), and the U.S. Department of Labor's Occupational Safety and Health Administration ("OSHA").

39.     While CAMTS has withdrawn Classic's accreditation, the FAA, OSHA, and NTSB have found no issues with Classic that would warrant grounding its Carrier fleet in Utah and Colorado.  In some instances, CAMTS's accreditation standards exceed the already strict standards set by the above organizations.  For example, CAMTS's medic shift limits are much stricter than the shift limits set by the FAA and OSHA.  The FAA requires that a pilot receive at least 13 individual rest periods of 24-hours within a 90-day period.  In contrast, CAMTS requires a mandatory 8-hour rest period after *every* 24-hour shift or on-call period worked.  **In other words, a pilot under the FAA's regulations can technically work 77 straight days while a medic under CAMTS's regulations can only work one day at a time.**  (See ¶¶ 116-135 below).  Furthermore, OSHA currently has no requirements for extended or unusual work shifts.

40.     Classic has received the highest accreditation from the National Accreditation Alliance for Medical Transport Applications ("NAAMTA") and aviation safety regulators ARGUS International, Inc. and Wyvern.  NAAMTA's accreditation standards are similar to CAMTS and in some cases are more stringent.  Classic is in 100% compliance with NAAMTA's standards.  NAAMTA's accreditation is accepted as equivalent to CAMTS in several states, but it is not currently accepted in Utah or Colorado.  A copy of the NAAMTA Standards Manual is attached hereto, marked as "Exhibit D." and is incorporated herein by this reference.

41.     Classic is also currently approved to fly for the U.S. Department of Agriculture, the U.S. Department of the Interior and has been contracted by the U.S. Department of Defense.  Classic routinely flies private charters for numerous small and large businesses, including several Fortune 500 companies.

**B.  Many of CAMTS's Accreditation Standards are Frivolous**

42.     Many of the deficiencies CAMTS cited Classic for have little to do with air-ambulance safety (e.g., requiring Classic to provide life insurance for employees, concerns about warning labels on fuel trucks, dictating to Classic who must make hiring decisions, etc.).  (See CAMTS's 8th Edition Standards, Page 2, 01.02.02 5).  (See CAMTS's Letter of October 4, 2012 at ¶¶ 6 and 19).  A copy of CAMTS's Letter of October 4, 2012 ("Appeal Denial Letter") is attached hereto, marked as "Exhibit E." and is incorporated herein by this reference.

43.     Many of CAMTS's constantly changing and ever-expanding accreditation standards are capricious and arbitrary.  Some of the standards are favorable to large and/or urban Carriers while those same standards are nearly impossible for smaller, rural Carriers to comply with.  (See ¶¶ 116-135 below).

44.     In setting their accreditation standards, CAMTS ignores the isolated locations and financial realties faced by small, rural-based Carriers.  CAMTS's overly-stringent accreditation standards punish small Carriers by virtue of the increased costs of implementing many of the standards.  For instance, the extreme labor shift limits imposed by CAMTS will effectively push many small rural Carriers out of business because those Carriers will not be able to afford to implement the changes necessary to

remain in compliance.  (See ¶¶ 116-135 below).  Similarly, CAMTS now mandates that Carriers provide life insurance for the Carrier's medical crews in the amount of triple the crew member's annual salary. (See CAMTS's 8th Edition Standards, Page 2, 01.02.02 5).  Again, this is a financial burden that larger Carriers can more easily absorb while the smaller Carriers will have more difficulty.  Like many of CAMTS's newer regulations, mandating life insurance for crew members is another regulation that has little to do with CAMTS's original mission of Carrier safety.

### C. Classic is in Substantial Compliance

45.    To obtain full accreditation, CAMTS requires that *"[e]ach aircraft, each site, each service, and each company must meet substantial compliance with the Accreditation Standards..."*  (See CAMTS's Procedure Manual at 03.04.00).   The CAMTS's Procedure Manual defines substantial compliance as:

> *"A medical transport service demonstrates overall quality of service consistent with the essential elements of the Accreditation Standards in the professional judgment and discretion of the Board. The service demonstrates a steady balance in all dynamic components which comprise their specific Program."*

(See CAMTS's Procedure Manual at 04.01.00).

46.    Assuming, arguendo, that Classic is guilty of the 20 deficiencies alleged by CAMTS, Classic is still in substantial compliance of CAMTS's accreditation standards.   There are approximately 1000 requirements in CAMTS's 8th Edition Standards.  According to CAMTS, Classic has not met 20 of them, which means that Classic is in compliance with the remaining 980 accreditation standards.  **As such,**

**Classic's accreditation was withdrawn while it was in compliance with 98.0% of CAMTS's accreditation standards.**

47.    With 98.0% compliance of the essential elements of the CAMTS's accreditation standards, Classic has demonstrated that it is in substantial compliance of the accreditation standards.  However, the CAMTS's Board refuses to acknowledge that Classic is in substantial compliance, ostensibly hiding behind the "*professional judgment and discretion of the Board*" language contained in 04.01.00.  The "*professional judgment and discretion of the Board*" language gives the CAMTS's Board absolute power to deny accreditation to a Carrier for any reason, even if the Carrier is in substantial compliance.

48.    CAMTS's letters also state the following information in the footer:

*"Accreditation decisions and action are based upon: responses in the PIF, observations at the time of the site visits, history of accreditation actions, incidents/accidents and* **other information received by the CAMTS office**".

(See Appeal Denial Letter, footer).

49.    Based on the above statement, a Carrier that is in full or substantial compliance with CAMTS's accreditation standards may still be rejected if the CAMTS's Board does not like the "history" of a program or if it receives "other information" about a Carrier.  It is presumed that any information that CAMTS obtains, including misinformation from competitors or former disgruntled employees, will be taken into account as part of the accreditation decision-making process.  CAMTS apparently will use information it receives from any source, reliable or not, and will not disclose the source(s) or the allegations to the applicant Carrier.

**D.   CAMTS's Options when an Applicant Carrier does not meet Substantial Compliance**

50.    Even if the CAMTS's Board determines that an applicant Carrier is not in substantial compliance with CAMTS's accreditation standards, withdrawing accreditation is not immediately required and is usually only administered as a last resort.   The CAMTS's Procedure Manual outlines several options available to the CAMTS's Board.   One option is Probational Accreditation.   A second option is Preliminary Denial of Accreditation.   Other options include Deferred Accreditation, On Hold Accreditation, Suspended Accreditation, or Under Special Review.   The most severe of the options is Withdrawal of Accreditation.

51.    Probational Accreditation allows a program that is not in substantial compliance to maintain its accreditation while working to correct areas of concern/deficiency.   However, CAMTS has arbitrarily decided that a Carrier may only hold Probational Accreditation for two consecutive terms.   Classic has and continues to be in substantial compliance, but CAMTS refuses to acknowledge it.   As such, CAMTS wrongly put Classic on Probational Accreditation in 2008 and 2010, and now CAMTS is stating that Classic is no longer eligible for Probational Accreditation.

52.    Preliminary Denial of Accreditation allows for a Carrier with minor deficiencies to correct the deficiencies without losing accreditation.   CAMTS's Procedure Manual provides:

> *"[CAMTS] may grant preliminary denial of accreditation when a Program has held Full or Probational accreditation, but upon a scheduled review for reaccreditation, [CAMTS] has concerns and/or there are deficiencies that are not in substantial compliance with the accreditation standards but*

*could be resolved or demonstrated or demonstrate significant progress in resolving the concerns and deficiencies within 90 days."*

(<u>See</u> CAMTS's Procedure Manual at section 4.01.00).

53.     If a Carrier is granted Preliminary Denial of Accreditation, then a Carrier's *"accreditation shall not be withdrawn"* during the 90 days that the Carrier has to make corrective actions or demonstrate corrective plans that meet the expectations as outlined by the CAMTS's Board.

54.     The majority of Classic's purported deficiencies were corrected within a matter of days, and several of the deficiencies were corrected *before* the on-site inspection was over.  Of the remaining deficiencies, all of them can be addressed within 90 days.  However, instead of allowing Classic to correct the minor deficiencies with a Preliminary Denial of Accreditation, CAMTS elected to give Classic the most severe sanction of Withdrawal of Accreditation with the accompanying six (6) month suspension.

55.     Classic appealed CAMTS's decision, but the CAMTS's appeal process is an appeal in name only.  Despite correcting the deficiencies, CAMTS denied Classic's appeal and specifically stated that correcting deficiencies is not a basis for granting an appeal to reinstate accreditation.  The Appeal Denial Letter states: "Corrections and additions since the site visit are not valid points for an appeal."  (<u>See</u> Appeal Denial Letter, Page 7, ¶ 3).  The Appeal Denial Letter also confirms the suspension and states that Classic cannot reapply for accreditation for six (6) months.  (<u>See</u> Appeal Denial Letter, Page 1, ¶ 4).

56.     In the past, Withdrawal of Accreditation and the accompanying six (6) month suspension were traditionally reserved for major deficiencies like a Carrier intentionally deceiving CAMTS's investigators and/or concealing evidence of major accidents.

57.     The six (6) month suspension on applying for reaccreditation is capricious and arbitrary, an unjustified penalty aimed at unfairly punishing Classic.   Classic has addressed the deficiencies cited by CAMTS and is willing to pay all the costs of immediately reapplying for accreditation.   As Classic will pay for the entire accreditation process, CAMTS is not damaged by allowing Classic to immediately reapply.

58.     The six (6) month suspension is an extreme punishment.   Neither the CAMTS's 8th Edition Standards nor the CAMTS's Procedure Manual state a substantive reason for barring a Carrier from immediately reapplying for accreditation.

59.     As stated above, CAMTS has several different levels of punishment of which Withdrawal of Accreditation and suspension being the most severe.  To justify the most severe punishment, CAMTS has expertly magnified Classic's minor infractions to the point where it could try to justify withdrawing accreditation.

60.     CAMTS has been extreme with its punishments in the past.   In 2004, CAMTS revoked accreditation from another rural Carrier and tried to suspend the Carrier from reapplying for five (5) years.

**E. Carriers Awarded Accreditation**

61.     If granted by the CAMTS's Board, an award of Full Accreditation lasts three (3) years before an application for renewal is required.

62.     A CAMTS-accredited Carrier is listed on CAMTS's website (www.camts.org), and CAMTS allows the accredited Carrier to use the CAMTS's logo on the Carrier's marketing and advertising materials.

63.     Upon information and belief, nearly all of the programs that applied for accreditation in 2012 received CAMTS's accreditation or received a lesser punishment than Classic.

64.     The CAMTS's website lists 150 accredited Carriers as of October 22, 2012, with few of the listed Carriers' statuses listed as anything but Full Accreditation.  If all of the Carriers had been scrutinized the same way Classic was, it is highly unlikely that 150 Carriers would have achieved a higher compliance score than Classic's score of 98.0%.

**SECTION III: HISTORY OF CLASSIC'S DIFFICULTIES WITH CAMTS LEADING UP TO THE WITHDRAWAL OF ACCREDITATION**

65.     In July, 2008, a Classic helicopter was involved in a mid-air collision with a helicopter operated by Air Methods Corporation ("Air Methods"), the largest publicly-owned Carrier in the United States and a competitor of Classic.  The Air Methods helicopter and a Classic helicopter collided on final approach.  Both helicopters crashed and all occupants were killed.

66.     As a result of the crash, in July, 2008, CAMTS placed Classic's accreditation on hold while it investigated and then eventually placed it on Probational

Complaint                                                    19

Accreditation.  Since the crash, Classic's relationship with CAMTS has been strained, specifically with Director Frazer.

67.    The following allegation is likely to have evidentiary support after a reasonable opportunity for further investigation or discovery: CAMTS and/or Director Frazer have a conflict of interest with one or more of Classic's competitors/adversaries. Despite the conflict of interest, Director Frazer has refused to recuse herself from the accreditation process involving Classic.  CAMTS and/or Director Frazer have been uncooperative throughout Classic's accreditation application process since being confronted with the conflict of interest.

68.    The CAMTS's Procedure Manual states that a conflict of interest is "*a real or seemingly incompatibility between a [CAMTS] Leader's private and/or personal interest and his/her duties*" and "*include **actual, potential, and perceived** conflicts of interest.*"

69.    Director Frazer founded CAMTS in 1991 and has exclusively governed it since its inception.  During her twenty-two year reign, Director Frazer has helped author CAMTS's accreditation standards and procedures, shaped its policies, and she ultimately decides what CAMTS will do.  While Director Frazer claims she is not a voting member of the CAMTS's Board, she is extremely influential in the CAMTS's Board's decisions regarding accreditation of Carriers.  CAMTS is ultimately under the control of Director Frazer; no individual at CAMTS has more power than she does.

70.    CAMTS and Director Frazer have refused to turn over the corporate minutes and meeting notes from the CAMTS's Board of Directors discussion of

Classic's withdrawal of accreditation and/or Classic's appeal.   In addition, Director Frazer has refused to work with Classic on granting an extension for Classic to regain accreditation.

## A. CAMTS elevated the complaints of a mentally-unstable individual in an effort to strip Classic of its accreditation

71.     On February 25, 2011, Ms. Francis Good ("Ms. Good"), the mentally-unstable partner/roommate of a former Classic employee, sent a series of bizarre letters to the FAA, the NTSB, CAMTS and Classic.   The letters, sent to Director Frazer and every member of the CAMTS's Board, claimed numerous dubious allegations against Classic and Classic's Program Director, Matt Stein ("Mr. Stein").   It was obvious from the content of the letters that Ms. Good was troubled.   Ms. Good had a delusional fear of Mr. Stein and was convinced that he had some sort of death wish.   For instance, Ms. Good's letters alleged that Mr. Stein had "an extremely strong urge for self destruction," "childhood control issues" and "unresolved psychological issues."   Ms. Good warned that Mr. Stein must be stopped before he "destroys himself, and takes everything in range with him."   A copy of the Fran Good Letters ("Fran Good Letters") is attached hereto, marked as "Exhibit F." and is incorporated herein by this reference.

72.     Ms. Good personally contacted Director Frazer and/or CAMTS on an unknown number of occasions and accused Classic of additional unknown misdeeds. Despite repeated requests by Classic, Director Frazer and CAMTS have repeatedly refused to turn over any of the additional allegations made by Mrs. Good, citing the allegations as confidential.   Classic is still unsure what allegations Ms. Good relayed to

Director Frazer and/or CAMTS or how much Ms. Good's allegations played a role in CAMTS withdrawing accreditation from Classic.

73.     Ms. Good made multiple suicide attempts and eventually successfully committed suicide within several weeks of her communications with Director Frazer and/or CAMTS.

74.     The FAA conducted a thorough investigation of Classic as a result of Ms. Good's allegations.   After the investigation, the FAA did not issue a Letter of Investigation, thus signaling that its investigation found no safety problems with Classic.

75.     Despite the FAA investigation clearing Classic of any wrongdoing, Director Frazer continued to give credence to and used Ms. Good's unsubstantiated and outrageous allegations in an attempt to discredit and deny accreditation to Classic. During discussions with Director Frazer about CAMTS's refusal to accredit Classic, it became clear to Mr. Stein that Director Frazer was extremely sympathetic to Ms. Good's complaints about Classic.  Mr. Stein heard reports from a Classic employee that Director Frazer was "in the back pocket" of Ms. Good.

76.     Director Frazer also overstepped the scope of her authority by inexplicably intervening in Classic's day-to-day human resource management.  In one instance, a Classic flight paramedic received a disciplinary warning by her supervisor, and within hours Director Frazer contacted Mr. Stein to inquire about the situation.  Director Frazer said that she had received anonymous information that Classic was harassing and intimidating its employees, and she demanded to know what was going on.  Director

Frazer's intrusion into Classic's personnel management was unwarranted and demonstrates her distrust and animosity toward Classic.

77.     Classic believes Director Frazer acted outside the scope of her authority as Board of Director and/or acted in bad faith when she refused to treat Classic fairly during the accreditation process.  Classic believes the numerous personal phone calls with and/or sympathy for Ms. Good motivated Director Frazer to target Classic, and that Director Frazer convinced the CAMTS's Board to unfairly scrutinize Classic.  Director Frazer's personal relationship with Ms. Good clouded Director Frazer's ability to treat Classic fairly.  Upon information and belief, Director Frazer was looking for a reason to strip Classic of its accreditation, and she used the unsubstantiated claims of Ms. Good as the basis for convincing the CAMTS's Board to eventually strip Classic of its accreditation.

78.     In July, 2010, during Classic's reaccreditation inspection, CAMTS put Classic on Preliminary Denial of Accreditation which allowed Classic 90 days from July 24, 2010 until October 24, 2010 to address and correct any issues.

79.     On or about August 7, 2010, Classic's representatives flew to Minneapolis, Minnesota to meet with CAMTS in a proactive effort to resolve the issues CAMTS cited in refusing to grant Full Accreditation to Classic.

80.     As directed by CAMTS at the Minneapolis meeting, Classic subsequently paid a CAMTS-approved consultant to instruct Classic on how to appease CAMTS and regain Full Accreditation.

81.   At considerable expense, Classic had several additional on-site inspections performed and implemented the consultant's suggested changes.

82.   Classic was informed by the consultant that he would recommend to CAMTS that Classic should receive Full Accreditation.

83.   On November 10, 2010, despite Classic's efforts and the consultant's recommendation that Classic receive Full Accreditation, CAMTS withdrew accreditation from Classic.

84.   After further negotiations, CAMTS and Classic entered into a Consent Agreement where CAMTS agreed to continue Classic's Probational Accreditation until July 24, 2012 if Classic performed certain obligations.  Among the obligations, Classic agreed to pay a CAMTS's Board Member to be assigned as a "Special Master" to consult with and monitor Classic in an effort to help Classic continue to meet CAMTS's standards.  The Special Master charged $200.00 an hour to consult Classic.  Among the stipulations in the Consent Agreement, Classic agreed to numerous inspections. The Consent Agreement also stated that CAMTS had the right to "take any and all action" regarding Classic's accreditation if significant safety issues were identified by CAMTS.

85.   Pursuant to the CAMTS's Procedure Manual, Classic applied for accreditation three (3) months prior to the expiration of the Consent Agreement.

86.   The Consent Agreement expired on July 24, 2012 without CAMTS alerting Classic to any significant safety issues that would delay accreditation.

87.     On July 30, 2012, six (6) days after the expiration of the Consent Agreement, CAMTS sent written notice ("Withdrawal Letter") to Classic stating that Classic's accreditation would be withdrawn within 30 days. A copy of the Withdrawal Letter is attached hereto, marked as "Exhibit G." and is incorporated herein by this reference.

### SECTION IV: 2012 WITHDRAWAL OF ACCREDITATION; DENIAL OF CLASSIC'S APPEAL

88.     The Withdrawal Letter stated that Classic's withdrawal of accreditation was based upon four (4) areas of concern and 20 areas of deficiency.  CAMTS stated that it would send notice of the Withdrawal of Accreditation to the State of Utah and Colorado.

89.     CAMTS's withdrawal of Classic's accreditation was improper based on a combination of: (1) misinterpretations by the site inspectors that Classic did not comply with the standards, (2) Classic being held to a higher standard than other Carriers, and (3) shift limits that are impossible for a rural Carrier to maintain.

90.     The following allegation is likely to have evidentiary support after a reasonable opportunity for further investigation or discovery: CAMTS's Board was influenced and/or conspired to deny Classic's accreditation.  Director Frazer unfairly influenced the CAMTS's Board to withhold accreditation from Classic based on the unsubstantiated claims of Ms. Good, Director Frazer's strained relationship with Classic, and Director Frazer's/CAMTS's conflict of interest with Classic's competitor.

91.     Classic believes that the majority of the cited Areas of Concern and Areas of Deficiency claimed by CAMTS were related to items of submitted documentation included in the PIF that were overlooked by CAMTS.

92.     Classic complied with the PIF requirements as written.  The PIF did not specifically request documentation that CAMTS alleged was missing.   CAMTS made no effort to request any of the alleged missing documents at any time; instead, CAMTS penalized Classic without warning. There were also apparent misrepresentations by the on-site inspectors, as many of the evaluation scores were not accurate.

93.     In following CAMTS's Due Process Procedures outlined in the CAMTS's Procedure Manual, Classic submitted an appeal to CAMTS that addressed all of the Areas of Concern and Areas of Deficiency. (See CAMTS's Procedure Manual, 04.02.00).

94.     Classic addressed the four (4) Areas of Concern and 20 Areas of Deficiency that CAMTS listed in the Withdrawal Letter and the Appeal Denial Letter. (See Appeal Denial Letter, Areas of Concern).  Regardless, CAMTS rejected Classic's appeal and upheld the Withdrawal of Accreditation.  CAMTS upheld 18 of the 20 Areas of Deficiency and all four (4) of the Areas of Concern.   (See Appeal Denial Letter).

95.     Classic has corrected all of the Areas of Concern and 19 of the 20 Areas of Deficiency, giving Classic compliance with 999 of approximately 1000 CAMTS accreditation standards.  With 99.9% compliance, Classic is in substantial compliance necessary to receive Full Accreditation.

### SECTION V: ALLEGED DEFICIENCIES; CLASSIC'S RESPONSES

**A.  Minor Deficiencies Used to Deny Accreditation**

96.     CAMTS cited several deficiencies that were so minor that they should not have been used as a basis to deny or delay accreditation.  Many of the following so-called deficiencies were not deficiencies at all or were fixed within minutes.  In addition, CAMTS cited several deficiencies that were based upon requiring Classic to meet an unwritten rule or higher standard than outlined in the CAMTS's accreditation standards.

97.     Minor Deficiency #1: CAMTS alleges that a Classic hazmat placard was "faded" on a fuel truck.   Classic replaced the faded hazmat placard immediately.  Classic believes that this is such a minor deficiency that it should not have been listed as a reason for withdrawing accreditation.  In the Appeal Denial Letter, CAMTS admits that Classic resolved the issue.   As Classic is in full or substantial compliance, this deficiency should be overturned and not be used as a basis to withdraw or delay accreditation.  (<u>See</u> Appeal Denial Letter, Area of Deficiency #19; CAMTS's 8th Edition Standards: Page 67, 05.11.02 5.).

98.     Minor Deficiency #2:  CAMTS alleges that one of the stretchers on an airplane had only two patient restraint straps instead of three.   This deficiency was corrected on-site during the inspection and was so minor that it should not have been listed as a reason for withdrawing accreditation.   CAMTS upheld the deficiency on appeal stating that even though it was resolved on site it was still not a valid point of appeal.   As Classic is in full or substantial compliance, this deficiency should be overturned and not be used as a basis to withdraw or delay accreditation.  (<u>See</u> Appeal

Denial Letter, Area of Deficiency #13; CAMTS's 8th Edition Standards: Page 33, 02.05.10 3. a.).

99.     Minor Deficiency #3:  CAMTS alleges that one of Classic's new Medical Directors did not personally interview and/or was not actively involved in the hiring or education of all medical staff members ("Staff Members").   This is simply untrue. Classic's Medical Directors are actively involved in the hiring process; they coordinate with the Chief Flight Nurse and approve every single applicant as part of the screening process.   The only Staff Members that the new Medical Director was not actively involved in the hiring process were Staff Members who were employed prior to his arrival.  Furthermore, CAMTS is demanding that Classic meet a limited interpretation of a rule that CAMTS will soon no longer enforce.  The old CAMTS's 8th Edition Standards states: "*The medical director(s) [must be] actively involved in hiring, training and continuing education of all medical personnel for the service.*"  The new CAMTS's 9th Edition Standards state: "*The medical director(s) [must be] actively involved in the hiring* ***process****, training and continuing education of all medical personnel for the service.*" CAMTS upheld the deficiency on Classic's appeal despite admitting that the new CAMTS's 9th Edition Standards includes a broader interpretation of the rule.  As such, Classic is being punished for the interpretation of a rule that CAMTS will soon no longer enforce.   Regardless, Classic meets the CAMTS's 8th Edition Standards and the CAMTS's 9th Edition Standards under 02.01.06.   CAMTS's allegation that Classic's Medical Director was not involved in the education of Staff Members is also untrue. Classic's Medical Directors are actively involved in the training and continuing education

process of all Staff Members. CAMTS correctly acknowledged the Medical Director's involvement in training (CAMTS only cited the Medical Director as "not involved in the hiring process and continuing education," and it did not cite lack of training as part of the deficiency).  As training is clearly a form of continuing education, this should not have been used as a basis for a deficiency.  As Classic is in full or substantial compliance, this deficiency should be overturned and not be used as a basis to withdraw or delay accreditation.  (See Appeal Denial Letter, Area of Deficiency #6; CAMTS's 8th Edition Standards: Page 20, 02.01.06; CAMTS's 9th Edition Standards: Page 21, 02.01.06).

100.   Minor Deficiency #4:  CAMTS alleges that Classic's annual tuberculosis testing was lacking, even though Classic follows the guidelines set by the U.S. Department of Health and Human Services' Center for Disease Control ("CDC").  CAMTS's standards simply require compliance with current CDC guidelines, so Classic is compliant with CAMTS's accreditation standards.  On Classic's Appeal, CAMTS admitted that Classic is in compliance with the current CDC guidelines and thus acknowledged that Classic was being held to a higher standard that was not included in the written rule.  CAMTS overturned the deficiency on appeal. (See Appeal Denial Letter, Area of Deficiency #15; CAMTS's 8th Edition Standards: Page 35, 02.06.07 1.b.).

101.   Minor Deficiency #5: CAMTS alleges that Classic did not perform emergency drills at two bases.  This is incorrect.  Emergency drills were conducted at the Page, Arizona base on April 20, 2012; the Vernal, Utah base on May 2, 2012; and the Riverton, Wyoming base on April 29, 2012.   Classic submitted additional documentation to CAMTS proving that the drills were performed, and Classic continues

to perform the drills as required.  CAMTS upheld the deficiency on appeal stating that the documentation proving that the drills were conducted was "scanty."  The CAMTS's standard does not specify that any documentation is required to fulfill 03.08.03; it simply states that a "*general test of all emergency procedures … will also be conducted on an annual basis.*"  As no documentation is required, CAMTS is again holding Classic to a higher standard than written in the CAMTS's standards.  As Classic is in full or substantial compliance, this deficiency should be overturned and not be used as a basis to withdraw or delay accreditation.  (See Appeal Denial Letter, Area of Deficiency #17; CAMTS's 8th Edition Standards: Page 41, 03.08.03).

102.   Minor Deficiency #6: CAMTS alleges that only one of Classic's Registered Nurses ("RN") has advance certifications.  This alleged deficiency is based upon CAMTS's incorrect scoring and/or misinterpretation of Classic's PIF.  At the time Classic's PIF was submitted, 27 percent of the RN Staff Members had advanced certifications.  All of Classic's RN Staff Members are scheduled to be certified by February 1st 2013.  CAMTS upheld the deficiency on appeal.  Classic is currently in substantial compliance and will be in full compliance shortly.  As Classic is in full or substantial compliance, this deficiency should be overturned and not be used as a basis to withdraw or delay accreditation.  (See Appeal Denial Letter, Area of Deficiency #11; CAMTS's 8th Edition Standards: Page 28, 02.04.01 3. f.).

103.  Minor Deficiency #7: CAMTS alleges that Classic regularly and permanently stores medicine without a Drug Enforcement Agency ("DEA") license.  Classic does not permanently store or dispense narcotics or controlled substances from

any base.  Classic restocks medications from local hospital pharmacies.  In the instance of this reported deficiency, there was a nationwide drug supply shortage and Classic obtained a DEA Form 222 that allowed Classic to restock medication on-site during the shortage.  A DEA Form 222 is similar to a prescription in that it allows a Carrier to have legal possession of the drugs.  A copy of the DEA Form 222 is attached hereto, marked as "Exhibit H." and is incorporated herein by this reference.  Classic obtained the DEA Form 222 form because Classic's Staff Members wanted to make sure they had enough medication if they were unable to restock at the local hospital.  Again, CAMTS is ignoring the unique situations faced by a rural base.  If the Staff Members did not have enough medication, a patient could have died in the time it would have taken to make a round-trip to find a hospital pharmacy that had the drug in stock.  Classic is currently inquiring about getting a DEA license so it can permanently store an ample supply of medication at the bases in the event there is another shortage.  Despite DEA approval of Classic's restocking of the drugs, CAMTS upheld the deficiency on appeal.  (See Appeal Denial Letter, Area of Deficiency #12; CAMTS's 8th Edition Standards: Page 31, 02.05.08 3. a.).

104.   Minor Deficiency #8: CAMTS alleges that Classic does not document its intubation training results correctly.  Essentially, Classic did the training correctly, but recorded the results of the training by "date and names" instead of by "age group."  Classic introduced a new intubation training form that specifically records age groups separately pursuant to the CAMTS's standard.  Despite admitting that Classic's new intubation training form meets CAMTS's accreditation standards, CAMTS upheld the

deficiency on appeal because the form "was not present at the time of the site visit." This deficiency was so minor that it should not have been listed as a reason for withdrawing accreditation. As Classic is in full or substantial compliance, this deficiency should be overturned and not be used as a basis to withdraw or delay accreditation. (See Appeal Denial Letter, Area of Deficiency #9; CAMTS's 8th Edition Standards: Page 27, 02.04.01 2. b.).

105.   Minor Deficiency #9: CAMTS alleges that Classic's Staff Members did not receive a certain area of didactic training required by CAMTS's Standards. Classic's applicable Staff Members have since obtained the training discussed above. CAMTS upheld the deficiency on appeal even though it has been corrected. As Classic is in full or substantial compliance, this deficiency should be overturned and not be used as a basis to withdraw or delay accreditation. (See Appeal Denial Letter, Area of Deficiency #10; CAMTS's 8th Edition Standards: Page 28, 02.04.01 3. c.).

106.   Minor Deficiency #10: CAMTS alleges that records for annual infection control training could not be located during the site inspection and that there was not adequate infection control training provided for the mechanics. This has been corrected; all mechanics complete the initial training upon hiring. The above records were located and the entire maintenance staff has been added to the recurrent education database. CAMTS upheld the deficiency on appeal even though it has been corrected. Classic believes that this is such a minor deficiency that it should not have been listed as a reason for withdrawing accreditation. As Classic is in full or substantial compliance, this deficiency should be overturned and not be used as a basis to

withdraw or delay accreditation.  (See Appeal Denial Letter, Area of Deficiency #14; CAMTS's 8th Edition Standards: Page 35, 02.06.04).

107.   Minor Deficiency #11: CAMTS alleges that Classic did not perform a certain type of drill correctly and then reviewed the drill orally instead of disseminating a written "lessons learned" critique to the Staff Members.   Classic corrected this deficiency and now performs the correct Pre-Accident Incident Planning ("PAIP") drills. The Classic Communications Supervisor reviews the PAIP drills with Staff Members at the staff meeting following the drill.  The "lessons learned" critique is also placed in the meeting minutes for dissemination to all Staff Members.  CAMTS upheld the deficiency on appeal even though it has been corrected.  As Classic is in full or substantial compliance, this deficiency should be overturned and not be used as a basis to withdraw or delay accreditation.  (See Appeal Denial Letter, Area of Deficiency #16; CAMTS's 8th Edition Standards: Page 41, 03.08.03 2).

108.   Minor Deficiency #12: CAMTS alleges that Classic's Staff Members have not completed the FEMA 100 and 200 on-line courses.  This is not accurate; Classic's managing Staff Members completed the courses.   In addition, all applicable Staff Members have since completed the FEMA 100 and 200 on-line courses to correct this deficiency.  CAMTS upheld the deficiency on appeal.  As Classic is in full or substantial compliance, this deficiency should be overturned and not be used as a basis to withdraw or delay accreditation.  (See Appeal Denial Letter, Area of Deficiency #18; CAMTS's 8th Edition Standards: Page 49, 04.02.02 1. b.).

109.   Minor Deficiency #13: CAMTS alleges that Classic has no risk assessment tool for fixed-wing pilots.   Classic created a risk assessment tool and submitted evidence of it to CAMTS in the appeal.  In the Appeal Denial Letter, CAMTS acknowledges that: *"[a] [Fixed Wing] risk assessment tool was created since the site visit and submitted in the appeal*."  However, despite correcting the deficiency, CAMTS upheld the deficiency on the appeal. As Classic is in full or substantial compliance, this deficiency should be overturned and not be used as a basis to withdraw or delay accreditation.  (See Appeal Denial Letter, Area of Deficiency #20; CAMTS's 8th Edition Standards: Page 54, 04.04.03 2.).

110.   Minor Deficiency #14: CAMTS alleges that Classic's Staff Member training consisted of only the Health Insurance Portability and Accountability Act ("HIPAA") regulations.   CAMTS's standard states that compliance training should ensure that a Carrier must be "*in compliance with external laws and regulations, payer requirements and internal policies and procedures*."   The standard then lists several compliance issues that the training "***may include but are not limited to***."  The policy does not state that any or all of the list of topics must be taught.  Pursuant to the standard, Classic trained its Staff Members in several areas.  Classic trained its Staff Members on HIPAA regulations and on the external laws and regulations, payer requirements and internal policies and procedures that apply to the Staff Members.  In response to Classic's appeal, CAMTS admitted that the accreditation standard did not require the higher standard that CAMTS was demanding, and CAMTS overturned the deficiency.  (See

Appeal Denial Letter, Area of Deficiency #2; CAMTS's 8th Edition Standards: Page 5, 01.05.00).

111.   Minor Deficiency #15: CAMTS alleges that Classic used a medical mannequin instead of a real person during training; CAMTS also alleges that Classic used computer-based scenarios instead of printed (paper) scenarios.   CAMTS's standard states that a *"[s]imulation may include the use of dynamic human patient simulators, standardized patients (trained medical actors), computerized interactive devices, virtual reality and serious gaming.*"  Pursuant to the CAMTS's standard, Classic used a Laerdol Sim Man HPS (hereinafter "Mannequin"), a computer-based patient simulator that allowed its Staff Members to train using a Mannequin instead of a real person.  Classic obtained CAMTS's approval several years ago to utilize the Mannequin program in lieu of traditional clinical experiences.  Prior to making a large investment in this program, Classic had CAMTS's education department review the program and subsequently gained its approval.  Classic has computer-based written scenarios that the educators can refer to and these have been supplied to CAMTS.  CAMTS upheld the deficiency on appeal.  Apparently, CAMTS also marked this as a deficiency because Classic's written scenarios were computer-based and not printed out on paper.   As stated, Classic had permission to use the Mannequin computer program; Classic just needed to print out the scenarios to have them be considered "written."   Classic believes that this is such a minor deficiency that it should not have been listed as a reason for withdrawing accreditation.  As Classic is in full or substantial compliance, this deficiency should be overturned and not be used as a basis to withdraw or delay

accreditation.  (See Appeal Denial Letter, Area of Deficiency #8; CAMTS's 8th Edition Standards: Page 27, 02.04.01 2. b.).

112.   Minor Deficiency #16: CAMTS alleges that Classic's Medical Director did not provide quality improvement feedback on medical chart reviews.   The CAMTS's standard states that the Medical Director must be "*actively involved in the quality management (QM) program for the service*."  All of Classic's Medical Directors actively participate in the quality management program and submitted an audit form to CAMTS as part of Classic's PIF.   CAMTS upheld the deficiency on appeal stating that the submitted audit was not dated properly and that one of the three signatures on the audit was not legible.   Also, despite admitting that Classic has a process in place to provide feedback, CAMTS determined that Classic did not meet "the spirit of the standard" because there was not a forum for follow-up questions.   CAMTS further stated that Classic should be "discussing" feedback with the Staff Members and "not just submitting the [audit] form."   Again, the CAMTS's standard did not specify that an oral discussion of quality management was required.   Classic's Staff Members have access to a website where there is a blog for posting comments, asking questions and receiving feedback.   As such, Classic is in compliance with CAMTS's standard as it is plainly written. As Classic is in full or substantial compliance, this deficiency should be overturned and not be used as a basis to withdraw or delay accreditation. (See Appeal Denial Letter, Area of Deficiency #5).   (See Appeal Denial Letter, Area of Deficiency #5; CAMTS's 8th Edition Standards: Page 20, 02.01.03).

113.   Minor Deficiency #17: CAMTS alleges that Classic's Medical Directors had no recent safety and risk management training.  The CAMTS's standard plainly states that annual testing is only *"strongly encouraged"* and not required.  Furthermore, the Medical Director in question has received safety and risk management training as part of his Medical Director curriculum at the Air Medical Transport Conference.  CAMTS upheld the deficiency on appeal.  As the standard states that annual testing is only *"strongly encouraged"* and not required, Classic is in full compliance and this deficiency should be overturned and not be used as a basis to withdraw or delay accreditation. (See Appeal Denial Letter, Area of Deficiency #7; CAMTS's 8th Edition Standards: Page 20, 02.01.08).

114.   Minor Deficiency #18: CAMTS alleges that Classic did not share patient outcome studies with the Staff Members.  The CAMTS's standard plainly states that there just needs to be *"evidence of outcome studies."*  The CAMTS's standard does not specify that this information must be disseminated to the Staff Members.  Classic orally reviews the patient outcome studies at each staff meeting.  The meeting minutes are posted on Classic's website and a hard copy is placed in the "Read File" at each base. CAMTS was provided with the meeting minutes as part of the PIF.  Classic's PIF specifically states that meeting minutes were available to all Staff Members through the website and through the printed version.  In CAMTS's Appeal Denial Letter, CAMTS admitted that the CAMTS's standard does "not specifically state" that patient outcome studies must be disseminated to the staff, thus acknowledging that Classic was being held to a higher standard than outlined in the standard.  CAMTS upheld the deficiency

anyway, stating that it "**found evidence of tracking** but no evidence of an actual study with outcomes in meeting minutes."  As CAMTS admits it found evidence of patient outcome studies, this should not have been listed as a deficiency.  As Classic is in full or substantial compliance, this deficiency should be overturned and not be used as a basis to withdraw or delay accreditation.  (<u>See</u> Appeal Denial Letter, Area of Deficiency #3; CAMTS's 8th Edition Standards: Page 17, 01.12.01 5.h.).

115.   Minor Deficiency #19: CAMTS alleges that one of Classic's Medical Directors had not received training in CRM (Crew Resource Management) or AMRM (Air Medical Resource Management) because he was unfamiliar with the acronyms used by the site inspector.  CAMTS's Appeal Denial Letter states "*the physician was not familiar with the terms [AMRM and CRM].  The acronym AMRM may not be as familiar but CRM should be recognized by anyone in the air medical profession.*"  The CAMTS's standard states that the Medical Director must be familiar with Human Factors, Crew Resource Management, and Air Medical Resource Management; the standard does not specifically state that a Medical Director must be familiar with the associated acronyms. Classic's Medical Director completed training at the Air Medical Transport Conference, which covers Human Factors, Crew Resource Management, and Air Medical Resource Management.  In the case of this deficiency, the Medical Director was familiar with the concepts but not the colloquial acronyms used by the on-site inspectors. (<u>See</u> Withdrawal Letter; Appeal Denial Letter, Area of Deficiency #4; CAMTS's 8th Edition Standards: Page 19, 02.01.02 8).   The website www.acronymfinder.com lists 118 possibilities for the acronym CRM with the term Customer Relationship Management

being the most commonly used.  In addition to Crew Resource Management being a usage, the following medical/emergency terms were also listed as possible usages: Crisis Resource Manager, Cardiac Rhythm Management, Crisis Response Management, Compliant Records Management, Composite Risk Management, Continuous Risk Management, Clinical Risk Management, Conceptual Reference Model, and Crew Research Management.  With so many possible meanings for the acronym CRM, it is arguable that the Medical Director was reducing the risk for confusion by being more specific when choosing to use the entire phrase Crew Resource Management instead of the acronym CRM.  With thousands of acronyms in the medical profession, Classic stresses that understanding the underlying procedure/concept is more important than knowing the acronym.  For instance, if a physician understands how to provide cardiopulmonary resuscitation but does not refer to it as CPR, it does not mean that the doctor does not understand the procedure.  As the Medical Director understands the concepts of Human Factors, Crew Resource Management, and Air Medical Resource Management, Classic is in compliance with CAMTS's standard.  CAMTS upheld the deficiency on appeal, stating that the acronym CRM should be recognized by everyone in the air ambulance profession.  Penalizing Classic because its Medical Director was too specific with his medical terminology is absurd, and it should not have been listed as a deficiency for withdrawing accreditation. As Classic is in full or substantial compliance, this deficiency should be overturned and not be used as a basis to withdraw or delay accreditation.  (See Appeal Denial Letter, Area of Deficiency #4).

**B.  CAMTS's 24-Hour Shift Rule is the main reason that CAMTS withdrew accreditation from Classic; CAMTS's 24-Hour Shift Rule is intended to reduce competition from rural Carriers**

116.    CAMTS's Appeal Denial Letter stresses that Classic's failure to comply with CAMTS's 24-Hour Shift Rule is a "repeated deficiency and remains non-compliant with the standard."   The CAMTS's 8th Edition Standards state that *"[o]n-site shifts scheduled for a period to exceed 24 hours are not acceptable."*  The Standards further state that a Staff Member may work a maximum of a 24-hour shift only if it is followed by a minimum break of 8 hours.  (See CAMTS's 8th Edition Standards, Page 10, 01.08.01). CAMTS refuses to differentiate a "shift" from an "on-call period."   CAMTS deems all Classic's Staff Members that are on-call to be working a shift.   As such, the 24-Hour Shift Rule precludes Classic's Staff Members from working back-to-back on-call periods.   Under CAMTS's rigid interpretation, there is no difference between a Staff Member who performs actual duties (medical flights, etc.) for 24 continuous hours and a Staff Member who is on call for 24-hours and sleeps for 19 hours and performs duties for five (5) hours.

117.    CAMTS's 24-Hour Shift Rule is capricious and arbitrary and is discriminatory to rural bases.  The 24-Hour Shift Rule effectively shuts down Classic's rural bases because it is impossible to staff the base without back-to-back shifts.  This requirement is much more stringent than NAAMTA.  NAAMTA allows unlimited back-to-back on-call periods as long as there is an 8-hour break during every 24-hour on-call period.  (See NAAMTA Standards Manual, 1.8.3.).

118.   Classic hired Roger Coleman ("Mr. Coleman"), a CAMTS-approved consultant, to perform a Safety Culture Audit report for the Page, Arizona base on March 23-25, 2011.   A copy of the Safety Culture Audit Report is attached hereto, marked as "Exhibit I." and is incorporated herein by this reference.

119.   Classic's Staff Members work 72-hour on-call periods with a minimum of 10-hour breaks between flights.   Mr. Coleman found that although Classic's Staff Members are on-call for 72 hours, **each Staff Members averaged only five (5) hours of actual duty for every 24-hours on-call**.   Furthermore, not all of the five (5) hours of duty was spent flying, as much of that time was devoted to duties on the ground (e.g. reviewing charts, doing paperwork, restocking the aircraft with medication/supplies, etc.).   (See Safety Culture Audit Report, Annex 1-Audit Diary, #2, ¶ 2).

120.   Classic's Staff Members work 72-hour on-call periods because there are not enough qualified medical staff in the small town of Page, Arizona (population: 7,252) to serve at the base.   As noted by the Safety Culture Audit Report, Staff Members that live locally spend their 72-hour on-call period at home unless they are called out for a flight.   Over a six month average, the Safety Culture Audit Report noted that "each crewmember is assigned to one 4-5 hour mission per day and [has] about 20 hours down time a day."   The Safety Culture Audit Report went on to state that during an on-call period a Classic Staff Member "can go out to eat, shopping, exercise, etc." and "have freedom to roam the area" to "golf, mountain bike, etc."   (See Safety Culture Audit Report, Annex 1-Audit Diary, #2, ¶ 2).

121.   In a worst case scenario (when the Staff Members are extremely busy due to numerous flights), the Safety Culture Audit Report notes that the average crew flew 10 to 15 hours and had 57 to 62 hours of downtime during the 72-hour on-call period. So even when Classic's Staff Members are at their busiest, the Staff Members receive about four (4) to six (6) hours of downtime for every hour they work.  If a Staff Member feels fatigued, the Staff Member may put himself in "Time Out" and take himself off the schedule for a minimum of [six (6)] hours.  Furthermore, Classic's management is actively involved in assuring Staff Member flight times are tracked and will initiate a mandatory "Time Out" when appropriate.  (See Safety Culture Audit Report, Annex 1-Audit Diary, #2, ¶¶ 2-5).

122.   Due to the lack of local medical staff, many of Classic's Staff Members commute from the nearest large cities such as Las Vegas, Nevada; Phoenix, Arizona; Salt Lake City, Utah; and Los Angeles, California.  Most of Classic's Staff Members commute more than 5 hours to the base, work the 72-hour on-call period, then commute back home.  Commuting Staff Members stay at Classic's facility where each Staff Member has a private room with a queen-sized bed.  (See Safety Culture Audit Report, Annex 1-Audit Diary, #2, ¶¶ 2-5).  The facility is also equipped with showers, internet, cable, a kitchen, offices, and an entertainment room.  Because of the long downtimes and the high quality of the facility's living conditions, some commuting Staff Members volunteer to work back-to-back 72-hour on-call periods.  Reflecting on his own career in the U.S. Air Force, Mr. Coleman stated: "I think any Part 135/121 pilot would gladly work this six-day shift."  (See Safety Culture Audit Report, Annex 1-Audit Diary, #2, ¶ 7).

123.   Under Classic's unique circumstances, its Staff Members receive more rest working a single 72-hour on-call period than if they work three separate 24-hour on-call periods under CAMTS's 24-Hour Shift Rule.  In order for a Classic Staff Member from Salt Lake City, Utah, to work at the Page, Arizona, base for 72 hours on-call under CAMTS's 24-Hour Shift Rule, the Staff Member would have to commute 7-8 hours to Page, work a 24-hour on-call period, then commute 7-8 hours back to Salt Lake City, take the rest of the day off, then commute 7-8 hours back to Page to do the second 24-hour on-call period, then commute 7-8 hours back to Salt Lake City, take the rest of the day off, then commute 7-8 hours back to Page to do the third 24-hour on-call period.

124.   CAMTS has determined that it is preferable that a Classic Staff Member spend an *additional* 28-32 hours driving to and from the three (3) separate 24-hour on-call periods over a five (5) day period as opposed to working a single 72-hour on-call period over a three (3) day period and resting at the base for a minimum of 10 hours between flights.  As Classic Staff Members average only five (5) hours of actual work duty per day, imposing the CAMTS's 24-Hour Shift Rule would cause the Staff Members to spend twice as much time driving than actually working.

125.   The extra travel time, fuel cost and the lost wages from taking two days off make CAMTS's 24-Hour Shift Rule so impractical and counterproductive that the majority of Classic's commuting Staff Members have unequivocally stated that they will be forced to quit if the CAMTS's 24-Hour Shift Rule is imposed.  In an effort to lobby CAMTS on an exception to the 24-Hour Shift Rule, Classic's Staff Members wrote statements that were presented to CAMTS regarding the new rule.  A copy of the

numerous statements from Classic's Staff Members opposing CAMTS's shift limits is attached hereto, marked collectively as "Exhibit J." and is incorporated herein by this reference.  A sample of Classic's Staff Members comments include:

a. "...I feel that CAMTS has added a hug[e] safety concern for Classic Lifeguard employees.  Being the vast majority of us live outside of Page, the added travel exposure on 2 lane highways being much more dangerous than flying, I feel that CAMTS has no regard for my/our safety."  (See Exhibit J).

b. "If our shifts change...it would not be financial feasible for me to continue to work at Classic Lifeguard."  (See Exhibit J).

c. "…I will either be cutting back to part time or may be forced to resign from Classic...I will not be staying on fulltime. I write this with a heavy heart."  (See Exhibit J).

d. "It would become to[o] costly for me to come down 3 times a month to get 72 hours.  I would think that I am not the only one that will be in same boat."  (See Exhibit J).

e. "The extra driving time [is] both a [financial] burden, but also an added safety concern. I would love to write a letter to CAMTS stating the fact of road travel vs[.] air travel to prove this point.  I also continue to believe with my personal [experiences] at Guardian, that our schedule provides much more rest time than any, single aircraft base in America.  Anyway, I hate, let me repeat, hate that I have lost the 6 day shift."  (See Exhibit J).

f. "Although these shifts might not fit the industry standards, they are by far appropriate for Classic due to the fact that a lot of the employees travel great distances and at great expense. These 72 hour shifts provide me with the opportunity to stay at the Classic facility, fly, [develop] stable working and social relationships with the people I fly with and get adequate rest and down time in between flights."  (See Exhibit J).

g. "…the current recommendations by CAMTS … will unfortunate[ly] force me into decreasing my hours worked at Classic and reevaluate my job as a flight nurse for Classic." (See Exhibit J).

h. "What a shame it would be for the Flight industry and Classic if they were to lose highly qualified flight nurses and medics simply because CAMTS is unwilling to see the unique situation we have here at Classic Lifeguard." (See Exhibit J).

i. "By changing our scheduling template to require our medical personal to only work a maximum of 72 hour shifts, we are severely limiting our employee recruitment and retention ability." (See Exhibit J).

j. "It will not be cost effective for me to be traveling to Page, three times a month to attain the 72 hour requirement as a part-timer." (See Exhibit J).

126.  CAMTS did not grant Classic an exemption to the 24-Hour Shift Rule. CAMTS demands that Classic implement the 24-Hour Shift Rule despite awareness of the damage it would do to extremely rural Carriers like Classic.

127.  Mr. Coleman stated that CAMTS's 24-Hour Shift Rule would be impossible to implement at extremely rural locations.  After performing the Safety Culture Audit Report for Classic's base in Page, Arizona, the CAMTS's consultant stated: "A 24-hour on call period might work very effectively for a hospital in a large city where employment opportunities are abundant[,] but this would never work in Page due to lack of medical positions here locally."   The consultant went on to state that Classic's 72-hour single on-call period could work and that it is "an acceptable operational procedure protecting crewmembers and still providing mission coverage."  (See Safety Culture Audit Report, Annex 2-Findings/Recommendations, ¶ 5).

128.  It is impossible for Classic to comply with CAMTS's 24-Hour Shift Rule and stay in business.  Either less qualified local personnel will be hired or Classic will be forced to shut down its base, which will significantly reduce air-ambulance services in the area.

129.   As discussed above, the FAA allows a pilot to work up to 14-hours a day for 77 days straight and the OSHA website states that **"[c]urrently, there is not a specific OSHA Standard for extended or unusual work shifts."**  (See ¶ 39 above). Many emergency and medical workers are often on call for several days at a time, and these shifts are sanctioned by the governing bodies that regulate those professions. For example, the Accreditation Council for Graduate Medical Education ("ACGME") allows new doctors in residency to work up to 24-hours straight and up to 80-hours per week averaged over a four (4) week period (a resident may work up to 88-hours per week with special permission).  In remote locations with few medical providers, the on-call times are much longer.  In Page, Arizona, the General Surgeon is on call 24-hours a day for the entire year (unless he is out of town).

130.   The apparent goal of the CAMTS's 24-Hour Shift Rule is to provide maximum rest for Staff Members and to prevent fatigue and the accidents that are caused by fatigue.  Classic has presented documentation and studies to CAMTS that demonstrate that Classic's Staff Members are adequately rested.  Furthermore, most CAMTS's site surveyors, safety auditors and consultants have commented that Classic is doing a adequate job in making sure the Staff Members are well rested.

131.   Classic and CAMTS have clashed for years regarding CAMTS's 24-Hour Shift Rule.  Classic has conducted studies proving that Staff Member rest is greater using Classic's current shifts, but CAMTS refuses to compromise with Classic.  CAMTS claims to understand that Classic's bases are in a "unique rural environment," but

CAMTS still refuses to work with Classic on a compromise to the 24-Hour Shift Rule. (See Appeal Denial Letter, Area of Deficiency #1).

132.   CAMTS has also used the 24-Hour Shift Rule to inhibit Classic from expanding its business operations.   In 2010, Classic was contemplating opening another base in Jackson, Wyoming.   Classic visited the Jackson-area hospitals and received positive feedback from the hospitals about opening a base.   After CAMTS learned about Classic's plans to open a new base, the positive feedback from the hospitals mysteriously vanished and was replaced with resistance.   Incidentally, several large Carriers have bases in Jackson, and Classic would have increased competition in the area.

133.   On August 23, 2010, CAMTS sent a letter to Classic that inquired about Classic's plans to open a new base.   A copy of August 23, 2010 Letter is attached hereto, marked as "Exhibit K." and is incorporated herein by this reference.   CAMTS demanded that Classic "provide [CAMTS] an update on those plans" to open a new base, presumably for CAMTS's review and approval.   (See August 23, 2010 Letter, Page 2, ¶ 2).   CAMTS also warned that opening another base could "significantly impact pilot schedules" and implied enhanced scrutiny from CAMTS if Classic went forward with the base.   (Id.).

134.   Classic was still only exploring the idea of opening the base and was caught off guard by CAMTS's unwarranted intrusion into Classic's future business plans.   Facing demands and apparent resistance from CAMTS before the early planning stages of the base were even completed, Classic abandoned the idea because it

believed CAMTS would not allow it to happen and/or that CAMTS had already negatively influenced the Jackson-area hospitals against Classic.   By inserting themselves into and obstructing Classic's business plans, Director Frazer and CAMTS once again over-stepped their authority and roles as promoting Carrier safety.

135.   These facts amply demonstrate the arbitrary manner in which CAMTS denied to Classic the accreditation and recognition that would allow Classic to compete in the air-ambulances service marketplace and with other Carriers.

## C.  CAMTS's past draconian punishments; CAMTS's proactive effort to have Classic's air-ambulance licenses revoked

136.   This is not the first time that CAMTS's accreditation policies and practices have appeared to operate in an anticompetitive manner to keep smaller, rural Carrier from obtaining accreditation.   In 2004, CAMTS's attempted to suspend a small Carrier for *five (5) years*, essentially a death sentence.   The Court disallowed it.   (See Eagle Air Medical Corporation v. Commission on Accreditation of Medical Transport Systems, Civil No. 2-03-CV-93, 2003).

137.   Withdrawing Classic's accreditation and suspending Classic from reapplying for accreditation is apparently not enough for CAMTS.   CAMTS is now trying to have Classic stripped of its air-ambulance licenses in CAMTS-regulated states by proactively contacting those states and informing them that Classic's accreditation was withdrawn.

138.   In November, 2012, after CAMTS denied Classic's appeal, Classic contacted Colorado's Department of Public Health and Environment ("Colorado")

regarding the status of Classic's air-ambulance license.  Colorado informed Classic that Colorado would not check the status of Classic's CAMTS-accreditation status until Classic's air-ambulance license was up for renewal in June, 2013.  Colorado informed Classic that Classic's air-ambulance license would not be in jeopardy as long as Classic obtained CAMTS-accreditation by June, 2013.

139.   On December 20, 2012, Colorado sent a letter ("Colorado Letter") to Classic stating that it would need to investigate Classic because it received information from CAMTS regarding Classic.  A copy of the Colorado Letter is attached hereto, marked as "Exhibit L." and is incorporated herein by this reference.

140.   On January 2, 2013, in a phone conversation between Classic and Colorado, Colorado confirmed that the information CAMTS sent to Colorado that caused Colorado to launch the investigation into Classic.

## FIRST CAUSE OF ACTION
### (Declaratory Relief)

141.   Classic realleges the foregoing paragraphs as if fully rewritten herein.

142.   CAMTS misrepresented findings in Classic's PIF and the on-site inspections.   Many of the purported deficiencies were minor problems that were corrected within hours, and some were so minor that they were corrected within minutes.  All of the purported deficiencies that were possible to rectify were corrected by the time Classic's appeal was submitted.   Despite the corrections and substantial compliance, CAMTS inexplicably denied Classic's appeal and upheld the withdrawal of accreditation and the six (6) month suspension to reapply.  Furthermore, CAMTS has now launched a campaign to inform every CAMTS-regulated state that Classic is no

longer accredited, which has resulted in Colorado opening an investigation into Classic. Classic must wait six (6) months to reapply, and it will take several months for the accreditation process to complete and for Classic's accreditation to be restored.  In reality, the six (6) month suspension is a 9-to-12 month business-crippling sanction that will effectively destroy Classic and cost dozens of employees their jobs.

143.   CAMTS's Procedure Manual provides that CAMTS shall grant an applying Carrier Full Accreditation if a Carrier is in substantial compliance with the CAMTS's accreditation standards, has demonstrated progress in resolving previous deficiencies, and has no new significant deficiencies.  (See CAMTS's Procedure Manual: Page 98, 04.00.00).

144.   Classic met or exceeded 98.0% of CAMTS's accreditation standards to be in substantial compliance, demonstrated progress in resolving previous deficiencies, and had no new significant deficiencies, yet CAMTS withdrew accreditation from Classic.  Within 90 days of the stripping Classic of its accreditation, Classic has corrected 19 of the 20 deficiencies, giving Classic 99.9% compliance with CAMTS's accreditation standards.

145.   Classic is entitled to a declaration that CAMTS did not follow its Procedure Manual by withdrawing Classic's accreditation while Classic was in substantial compliance.

146.   CAMTS failed to follow its own Procedure Manual in withdrawing Classic's accreditation.  As a result, Classic was denied its contractual due process which must be corrected.  Classic is entitled to a declaration that Classic is in substantial

compliance with CAMTS's accreditation standards and a declaration that Classic's accreditation status is Full Accreditation or Probational Accreditation. In the alternative, Classic is entitled to a declaration that its status is Preliminary Denial of Accreditation and be given 90 days to address and resolve any Areas of Concern and Areas of Deficiency (while allowing Classic to be considered CAMTS-accredited), or, at worst, Classic is entitled to a declaration that CAMTS six (6) month suspension penalty is void and that Classic may immediately reapply for accreditation with CAMTS.

147. Classic is also entitled to a declaration that Classic is exempt from CAMTS's 24-Hour Shift Rule.

## SECOND CAUSE OF ACTION
### (Due Process – Federal Common Law)
### (Against Defendant CAMTS)

148. Classic realleges the foregoing paragraphs as if fully rewritten herein.

149. Classic is certified and/or received the highest accreditation from the FAA, NAAMTA, and aviation safety regulators ARGUS International, Inc. and Wyvern.

150. Classic is in substantial compliance with CAMTS's accreditation standards. As detailed above, at the time accreditation was denied, Classic was in compliance of 98.0% of CAMTS's accreditation standards. Classic has corrected all of the areas of concern and 19 of the 20 deficiencies, giving Classic compliance with 999 of approximately 1000 CAMTS accreditation standards (99.9% compliance).

151. CAMTS's decision that Classic is not in substantial compliance with the CAMTS's accreditation standards is arbitrary and capricious and a denial of due process. CAMTS did not follow its Procedure Manual by withdrawing Classic's

accreditation while Classic was in substantial compliance.   The denial of Full Accreditation, Probational Accreditation, or a status of Preliminary Denial of Accreditation is not rationally related to the facts in the record as required by federal common law as embodied in the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*

152.   Classic was denied both procedural and substantive due process. Procedural due process was denied because Classic was not given a meaningful opportunity to be heard before the CAMTS's Board.   The appeal was an appeal in name only; correcting the deficiencies was not a basis for granting an appeal to reinstate accreditation.   CAMTS did not follow its Procedure Manual by withdrawing Classic's accreditation while Classic was in substantial compliance.   Classic was also not afforded the usual courtesies given to other Carriers with minor deficiencies (Classic was not given a second site inspection, an extension to make corrections, or the 90-day grace period that accompanies the Preliminary Denial of Accreditation).

### THIRD CAUSE OF ACTION
**(Due Process – Utah Common Law)**
**(Against Defendant CAMTS)**

153.   Classic realleges the foregoing paragraphs as if fully rewritten herein.

154.   Classic is certified and/or received the highest accreditation from the FAA, NAAMTA, and aviation safety regulators ARGUS International, Inc. and Wyvern.

155.   Classic is in substantial compliance with CAMTS's accreditation standards.   As detailed above, at the time accreditation was denied, Classic was in compliance with 98.0% of CAMTS's accreditation standards.   Classic has corrected all

of the areas of concern and 19 of the 20 deficiencies, giving Classic compliance with 999 of approximately 1000 CAMTS accreditation standards (99.9% compliance).

156.   CAMTS's decision that Classic is not in substantial compliance with CAMTS's accreditation standards is arbitrary and capricious and a denial of due process.   CAMTS did not follow its Procedure Manual by withdrawing Classic's accreditation while Classic was in substantial compliance.   The denial of Full Accreditation is not rationally related to the facts in the record as required by Utah common law and is consequently a violation of due process.

**FOURTH CAUSE OF ACTION**
**(Breach of Contract)**
**(Against Defendant CAMTS)**

157.   Classic realleges the foregoing paragraphs as if fully rewritten herein.

158.   In exchange for money paid by Classic to CAMTS, CAMTS agreed to provide accreditation services to Classic, and the two parties are governed in that regard by the terms and conditions of CAMTS's 8th Edition Standards and the CAMTS's Procedure Manual.

159.   CAMTS failed to follow the plain language interpretation of its own standards and held Classic to higher standards than other Carriers and/or purposely misinterpreted some of the information in Classic's PIF.   CAMTS's actions resulted in frivolous and unsubstantiated deficiencies alleged against Classic.

160.   Even with misinterpreted and/or incorrect data, Classic still complied with 98.0% of the CAMTS's accreditation standards.   Classic is in substantial compliance

with the CAMTS's 8th Edition Standards and the CAMTS's Procedure Manual and is deserving of Full Accreditation.

161.   CAMTS failed to recuse Director Frazer from Classic's accreditation process, despite Director Frazer's real or perceived conflict of interest.

162.   CAMTS's actions in failing to follow the CAMTS's 8th Edition Standards and the CAMTS's Procedure Manual constitute a material breach of its contractual obligations to Classic.

163.   As a result of CAMTS's actions and failures to act, Classic has been damaged, and the damages are ongoing. Further, Classic was denied contractual due process which should be corrected immediately by the issuance of a temporary, preliminary and permanent injunctive relief in order to restore Classic to its status of Full Accreditation or Probational Accreditation or, at worst, to put Classic on a status of Preliminary Denial of Accreditation which would allow Classic to maintain its accreditation status while giving Classic "*ninety (90) days to make corrective actions or demonstrate corrective plans that meet the expectations of the Board.*"  (See CAMTS's Procedure Manual, Page 100, 04.01.00 C).

164.   Classic has no adequate remedy at law with respect to CAMTS's breach of the CAMTS's 8th Edition Standards and the CAMTS's Procedure Manual. Classic has suffered and continues to suffer major, irreparable loss of business and goodwill, rendering the requested injunction not only appropriate but necessary.  Classic has been damaged by the Defendants' conduct as complained of herein, in an amount to be determined at trial.

**FIFTH CAUSE OF ACTION**
**(Breach of Covenant of Good Faith and Fair Dealing)**
**(Against All Defendants)**

165.   Classic realleges the foregoing paragraphs as if fully rewritten herein.

166.   The Defendants' conduct and actions as outlined above have breached the covenant of good faith and fair dealing implied in CAMTS's Procedure Manual.

167.   Classic has been damaged and injured, and will continue to be damaged and injured, as a result of the conduct of the Defendants unless and until an injunction is issued that would require CAMTS to honor the CAMTS's Procedure Manual procedures.

**SIXTH CAUSE OF ACTION**
**(Interference with Economic Relations)**
**(Against All Defendants)**

168.   Classic realleges the foregoing paragraphs as if fully rewritten herein.

169.   The Defendants are aware of Classic's contractual relationships with the hospitals/contractors its serves and the importance of those relationships to Classic.

170.   In taking the actions described in this Complaint, the Defendants have intentionally and improperly interfered with previously-established business relationships and/or prospective business relations of which it knew or reasonably should have known existed between Classic and the hospitals/contractors it serves.

171.   The Defendants have engaged in such interference by improper means, including without limitation, breach of contract, conversion of goodwill, and violation of contractual and commonly accepted business ethics and practices.

172.   In doing so, the Defendants have acted for the predominant improper purpose of injuring Classic and/or by improper means contrary to law as described in the Complaint.

173.   The Defendants' interference was willful and malicious, and/or manifests a knowing and reckless indifference toward, and a disregard of, the rights of Classic and has caused injury to Classic in an amount to be established at trial, and to include an award for punitive damages.

## SEVENTH CAUSE OF ACTION
### (Business Disparagement / Defamation)
### (Against All Defendants)

174.   Classic realleges the foregoing paragraphs as if fully rewritten herein.

175.   Defendants did publish or cause to be published false statements harmful to the interests of Classic with the intent that the publication of the statements would cause harm to the interests of Classic.

176.   At the time Defendants published the false statements they knew that the statements were false or acted in reckless disregard of their truth or falsity.

177.   Classic has been damaged by the Defendants' conduct as complained of herein, in an amount to be determined at trial.

## EIGHTH CAUSE OF ACTION
### (Breach of Fiduciary Duty)
### (Against All Defendants)

178.   Classic realleges the foregoing paragraphs as if fully rewritten herein.

179.   CAMTS is the sole and exclusive accreditation agency for Classic to obtain accreditation under Utah and Colorado law.  As such, Defendants are a fiduciary

for Classic and have a duty to treat Classic fairly and equitably in administering the CAMTS's accreditation programs.

180.    Defendants failed to fulfill their fiduciary duty to Classic.

181.    Classic has been and will continue to be damaged as a result of Defendants' breach of their duties.  Such breaches are the proximate cause of the injury to Classic.

182.    Classic has been damaged by Defendants' actions in an amount to be established at trial.

183.    Defendants' breach of their fiduciary duty was willful and malicious or was conducted with reckless indifference toward Classic's rights and, as a result, Classic is entitled to an award of punitive damages.

### NINTH CAUSE OF ACTION
**(Promissory Estoppel)**
**(Against All Defendants)**

184.    Classic realleges the foregoing paragraphs as if fully rewritten herein.

185.    By providing Classic with both the CAMTS's 8th Edition Standards and the CAMTS's Procedure Manual, Defendants conveyed to Classic through its acts and words that they would follow the CAMTS's 8th Edition Standards and the CAMTS's Procedure Manual with respect to awarding Classic Full Accreditation if Classic was in substantial compliance with CAMTS's standards.

186.    Classic acted with prudence in relying on the promises set forth in the CAMTS's 8th Edition Standards and the CAMTS's Procedure Manual which Defendants

expected Classic to rely on.  In relying on the standards and the Procedure Manual, Classic has suffered damages.

187.   The damages Classic has suffered and continues to suffer include the damages of loss of goodwill and reputation, which it will continue to suffer unless and until an injunction is issued that would require Defendants to honor the Procedure Manual procedures of awarding Full Accreditation to a Carrier that is in substantial compliance.

**TENTH CAUSE OF ACTION**
**(Antitrust – 15 U.S.C. § 1)**
**(Against All Defendants)**

188.   Classic realleges the foregoing paragraphs as if fully rewritten herein.

189.   Section 1 of the Sherman Act, 15 U.S.C. § 1, prohibits contracts, combinations, or conspiracies in restraint of trade.  A violation of Section 1 is punishable as a felony, and is subject to a private right of action for treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, and injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26.

190.   CAMTS's accreditation is essential to effectively compete in the Utah and Colorado markets, as both states require the CAMTS's accreditation for a Carrier to obtain an air-ambulance license.  In addition, denying accreditation puts Classic at a disadvantage with contractors in other states that require or give preference to Carriers that are CAMTS-accredited.

191.   Some of CAMTS's accreditation standards are impossible and/or unfair for Classic to meet.  CAMTS's 24-Hour Shift Rule is impossible for Classic to meet and still

stay in business.  CAMTS's requirement of "substantial compliance" is a vague and subjective standard that changes at the whim of the CAMTS's Board.  CAMTS's withdrawal of Classic's accreditation is an improper exclusion as a result of unreasonable standards.

192.   The CAMTS's Board is made up of several board members that have a conflict of interest by being employed by larger Carriers or by companies that have a vested interest in larger Carriers.  Director Frazer also has a conflict of interest via her personal connection to a large Carrier.  The Defendants have an incentive to deny accreditation to Classic, as it removes another small Carrier competitor from the market.

193.   As detailed above, Classic was in substantial compliance (98.0% compliance) with CAMTS's accreditation standards when its accreditation was withdrawn.  Classic is now 99.9% in compliance with CAMTS's accreditation standards.  Furthermore, Classic has received the highest accreditation from NAAMTA, a Carrier accreditation agency that has standards that mirror CAMTS's standards.

194.   CAMTS's withdrawal of Classic's accreditation substantially restrains and injures competition in the relevant market, and will continue to do so absent the injunctive relief Classic seeks.

195.   CAMTS's conduct constitutes an unreasonable restraint of trade under either the "Quick Look" or Rule of Reason tests.

196.   CAMTS maintains substantial market power as the gatekeeper for determining what Carriers will receive CAMTS's accreditation, a status important for the

numerous reasons detailed above.  CAMTS completely dominates and controls these markets.

197.   Other than minor, frivolous deficiencies, CAMTS has advanced no substantial, consistent justification for denying Classic accreditation.

198.   Allowing CAMTS to exclude Classic is anticompetitive, as it does not assure in any way that the public will receive better quality or lower-cost air-ambulance services.  To the contrary, it will likely result in reduced air-ambulance services in remote areas and slower emergency response times.  The lack of competition will likely also lead to the increased cost of air-ambulance services.

199.   Even if the refusal to accredit Classic is not the product of an intentional boycott, CAMTS's application of its standards and procedures in these circumstances is unreasonable and in violation of Section 1 of the Sherman Act as an unreasonable restraint of trade.

200.   In additional to damages, permanent injunctive relief is required to prevent the harm highlighted here, because monetary damages alone will be inadequate to compensate Classic for the irreparable harm it will continue to suffer absent relief.

201.   Monetary damages are, however, sought against CAMTS in the excess of $10,000,000.00 for the injury to Classic.

**ELEVENTH CAUSE OF ACTION**
**(Antitrust – 15 U.S.C. § 2)**
**(Against All Defendants)**

202.   Classic realleges the foregoing paragraphs as if fully rewritten herein.

203.   Section 2 of the Sherman Act, 15 U.S.C. §2, prohibits monopolization, attempts to monopolize, or conspiracies to monopolize interstate commerce.  A violation of Section 2 is punishable as a felony, and is subject to a private right of action for treble damages under Section 4 of the Clayton Act, 15 U.S.C. §15, and injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26.

204.   As discussed above, CAMTS enjoys monopoly power in accrediting air-ambulance Carriers.  CAMTS decides which Carriers are eligible to conduct business within certain states or receive preferential status from hiring organizations.

205.   CAMTS writes the rules and chooses how the rules will be enforced. CAMTS's standards demand that Carriers be in substantial compliance, and then the CAMTS's Board subjectively defines substantial compliance as whatever it wants it to be for each Carrier.  Essentially, CAMTS picks winners and losers; it decides what Carriers will operate in the air-ambulance industry in Utah and Colorado.  The CAMTS's Board is dominated by representatives who favor the large Carriers; it does not adequately represent smaller, rural-based Carriers.  As such, CAMTS has tailored its accreditation standards to help the large Carriers and hurt small Carriers, thus reducing competition.

206.   As detailed above, Classic is in substantial compliance with the CAMTS's accreditation standards; specifically, Classic was 98.0% compliant at the time accreditation was withdrawn and is currently 99.9% compliant.  Of the 20 deficiencies, 19 were minor and easily corrected.  The only standard that Classic truly cannot comply with is CAMTS's 24-Hour Shift Rule.  CAMTS refuses to compromise on its 24-Hour

Shift Rule.  Again, this is an attempt to put Classic out of business.  Accordingly, and in light of the approval CAMTS has granted to similarly evaluated Carriers, Classic should be entitled to Full Accreditation. The continued denial constitutes an abuse of CAMTS's market power, for which Classic has been and will continue to be injured.

### TWELFTH CAUSE OF ACTION
**(Utah Antitrust Act – U.C.A. § 76-10-911 et seq.)**
**(Against All Defendants)**

207.    Classic realleges the foregoing paragraphs as if fully rewritten herein.

208.    Defendants have entered into unlawful horizontal contracts, combinations or conspiracies with its competitors in violation of Utah Code Ann. § 76-10-911, et seq.

209.    Defendants have engaged in unlawful monopoly maintenance in the relevant market in violation of Utah Code Ann. § 76-10-911, et seq.

210.    Defendants have engaged in exclusionary conduct in an attempt to monopolize the relevant market in violation of Utah Code Ann. § 76-10-911, et seq. CAMTS has acted with specific intent to achieve a monopoly in the relevant market. Given its substantial size and market share, a dangerous probability exists that, unless restrained, CAMTS will achieve monopoly power in the relevant market.

211.    Defendants' conduct has had anticompetitive effects in the relevant market, including those described above. Classic has been injured, or is threatened with injury or damage, in its business or property due to Defendants' conduct.

WHEREFORE, Plaintiffs requests Judgment as set forth below:

1.      A declaration that CAMTS failed to follow the procedures and standards set forth in its CAMTS's 8th Edition Standards and CAMTS's Procedure Manual, and a declaration that Classic's accreditation status is either Full Accreditation, Probational Accreditation, or, at worst, Preliminary Denial of Accreditation.

2.      A declaration that CAMTS's 6-month suspension is void and a declaration that Classic is exempt from CAMTS's 24-Hour Shift Rule.

3.      A temporary, preliminary and permanent injunction enjoining CAMTS from violating its contractual obligations to Classic, from continuing the suspension of Classic, exempting Classic from the 24-Hour Rule, and restoring Classic to a status of Full Accreditation or Probational Accreditation, or, at worst, Preliminary Denial of Accreditation and restoring Classic's name on CAMTS's list of accredited services on the CAMTS's website and other such lists.

4.      An award of damages, including punitive damages, against Defendants in an amount to be proven at trial but more than $10,000,000.00.

5.      An award of attorney's fees and costs incurred by Classic in bringing and prosecuting this action.

6.      Such other relief as the Court deems just and proper.

DATED this 10th day of January, 2012.


By: **/s/ Richard L. Jenson**
       Richard L. Jenson
       Attorney for Plaintiffs

<u>Plaintiffs' address</u>:
Classic Air Care, LLC d/b/a Classic Lifeguard
c/o Richard L. Jenson
2244 South 1640 West
Woods Cross, Utah 84087